**Michigan Supreme Court**
**Lansing, Michigan**

# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

JORDAN v DEPARTMENT OF HEALTH AND HUMAN SERVICES

Docket No. 162485. Argued on application for leave to appeal May 4, 2022. Decided July 28, 2022.

Helen Jordan, a nurse who was formerly employed by the predecessor to the Department of Health and Human Services, challenged in the Michigan Compensation Appellate Commission (MCAC) the decision of a magistrate that she was not entitled to disability benefits under the Worker's Disability Compensation Act (WDCA), MCL 418.101 *et seq*. In 1995, plaintiff was working for defendant's predecessor when she was injured during an altercation with a patient. Plaintiff was prescribed opioid medication to treat leg and back pain that she said resulted from the 1995 injury, and she used the opioid medication continuously after the incident and became dependent upon it. Plaintiff began receiving disability benefits under the WDCA in 1996. In 2015, plaintiff underwent an independent medical examination at defendant's request pursuant to MCL 418.385. The doctor who conducted the examination concluded that any disability experienced by plaintiff was not the result of the 1995 incident, and defendant subsequently discontinued plaintiff's benefits. Plaintiff applied for reinstatement of her benefits under the WDCA. The magistrate concluded that plaintiff's loss of wage-earning capacity was not related to her 1995 work injury but to her opioid dependency and denied plaintiff's claim. Plaintiff appealed the magistrate's decision in the MCAC, and the MCAC reversed, concluding that plaintiff's opioid use was directly traceable to treatment for the work-related injury, so she was entitled to benefits. Defendant appealed by leave granted in the Court of Appeals. The Court, MARKEY, P.J., and GADOLA, J. (METER, J., dissenting), reversed the decision of the MCAC. 335 Mich App 57 (2020). Plaintiff applied for leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on whether to grant the application for leave to appeal or take other action. 508 Mich 951 (2021).

In a unanimous per curiam opinion, the Supreme Court *held*:

The record was too incomplete to facilitate meaningful appellate review. MCL 418.301(4)(a) defines disability as (1) "a limitation of an employee's wage earning capacity in work suitable to his or her qualifications and training," (2) "resulting from a personal injury or work-related disease." The magistrate found that plaintiff was not entitled to benefits, and the MCAC reversed, but in doing so, the MCAC did not explain what the factual support was for finding that plaintiff was disabled—either by referring to the magistrate's findings or to its own

review of the record. Rather, the MCAC concluded, citing the opinions of the parties' respective vocational experts, that plaintiff's opioid use was directly traceable to ameliorating her symptoms from the 1995 injury. Despite the MCAC's conclusion, whether the experts agreed that plaintiff had a limitation of her wage-earning capacity in work suitable to her qualifications and training was not clear from the record. Defendant's vocational expert testified that an opioid addiction would be an impediment to the jobs he located, while plaintiff's vocational expert opined that plaintiff was unemployable due to her use of opioids. However, the MCAC concluded that plaintiff's opioid use precluded her from the workforce without explaining whether it found that the experts' views were equivalent or whether they could be reconciled. The MCAC also did not support its conclusion that any limitation of plaintiff's wage-earning capacity "result[ed] from a personal injury or work-related disease" with factual findings, either its own, or those of the magistrate. While the MCAC has independent authority to perform its own fact-finding under MCL 418.861a(14), it did not purport to find additional facts beyond those in the magistrate's opinion but instead concluded that the magistrate's decision violated existing caselaw. However, the magistrate did not make sufficient factual findings for either the MCAC or the judiciary to determine whether there was legal error in its determination that plaintiff was no longer entitled to benefits. As a result, the Court of Appeals erred by deciding this case as a matter of law because further administrative proceedings were needed.

Decisions of the Court of Appeals and the MCAC vacated; case remanded to the Workers' Disability Compensation Appeals Commission (the commission) for further proceedings.

Justice VIVIANO, concurring, wrote separately to explain his view that on remand the commission or the magistrate should consider whether plaintiff had an affirmative duty to seek reasonable treatment for her opioid addiction, and if so, whether her failure to do so broke the chain of causation such that her opioid addiction was no longer traceable to her 1995 workplace injury. As early as 2000, plaintiff's doctors discussed drug detoxification with her and advised her that her chronic pain was due, in part, to opioid dependency. Secondary injuries that occur in the quasi-course of employment are compensable, but the chain of causation for such injuries can be broken by the claimant's intentional conduct. And when there are two injuries, as in this case (i.e., plaintiff's 1995 workplace injury and the opioid addiction), there generally must be a causal connection between the two. Arguably, a claimant's refusal to seek necessary medical treatment to regain wage-earning capacity breaks the necessary causal chain and renders the claimant ineligible for compensation. This conclusion depends, in part, on whether a claimant has a duty to seek or accept treatment. The WDCA creates such a duty in certain circumstances, and this Court has previously found that a claimant has a duty to make themselves whole before the employer must pay workers' compensation benefits. Further, if the commission or the magistrate concluded on remand that plaintiff remained disabled because of her opioid use, the magistrate or the commission would still need to determine whether the opioid addiction, a secondary injury, is traceable to plaintiff's 1995 workplace injury. If plaintiff was instructed by medical professionals to seek rehabilitation for her opioid dependency but refused, this could break the causal chain such that her current addiction should no longer be considered traceable to her original injury. On remand, therefore, the commission or magistrate should consider whether plaintiff had a duty to seek treatment for her addiction and how such a duty affected whether her loss of wage-earning capacity was traceable to her workplace injury. Further, because the issue of opioid addiction

implicates important policy concerns that are suited for the Legislature, not the courts, Justice VIVIANO noted that the Legislature might want to consider specifically addressing it.

Justice BERNSTEIN, concurring, agreed fully with the majority, but wrote separately because neither the relevant statute nor the relevant administrative rules provide sufficient instruction regarding how to properly adjudicate the case. Justice BERNSTEIN also expressed concern that holding employers responsible for paying these costs could have devastating consequences for small businesses, who represented 99% of Michigan employers, and he urged the Legislature to consider solutions that would adequately balance the interests of employees who developed long-term work-related disabilities with those of small businesses that might ultimately bear the responsibility of associated costs. The language of the WDCA does not make it clear who should be responsible for the payment of benefits in situations like the present one, in which an employee is injured at work and becomes disabled for decades as a result of the medical treatment of the initial workplace injury. The Workers' Disability Compensation Agency amended its rules in 2015 to reflect that reimbursement for opioid treatment is only available when the treatment is prescribed within 90 days after onset of the injury, with limited exceptions. Presumably, these amendments reflected some intent by the WDCA to minimize the amount of WDCA compensation available for opioid prescriptions, but they still do not address whether long-term wage loss stemming from treatment of a workplace injury with opioids is compensable through the WDCA. Because neither the WDCA nor the administrative rules indicate whether the employee, the employer, or the state is responsible for lost wages in a situation like the present one, there was no way to fairly allocate such costs. Therefore, the Legislature should provide further guidance about how these costs should be allocated.

Justice CAVANAGH, joined by Justice WELCH, concurring, agreed with the majority that a remand to the commission for additional factual findings was necessary for judicial review, but wrote separately to describe why the factual findings of the magistrate and the MCAC were insufficient and to provide guidance as to the factual findings required on remand. In order to resolve the case, the MCAC needed to make factual findings as to (1) whether plaintiff's opioid treatment was reasonable and necessary to treat her work-related injury when she began treatment in 1995 and (2) whether that opioid treatment resulted in a disability in 2015, either due to continued opioid treatment to treat pain caused by the work-related injury or due to an opioid addiction that developed because of treatment for the work-related injury. The magistrate and the MCAC erred by focusing only on plaintiff's condition in 2015 and not assessing how the work-related injury and any reasonable and necessary treatment for the injury contributed to a disability in 2015. A key issue was whether plaintiff suffered a disability in 2015 that was traceable to the work-related injury, but the magistrate's decision assumed that if plaintiff was no longer suffering the effects of the injury in 2015, then she was not entitled to benefits regardless of whether her opioid use was reasonable and necessary to treat the work-related injury before 2015 and this use resulted in a disability. Because of this assumption, the magistrate did not assess the treatment for plaintiff's injury in 1995 and instead limited her inquiry to the source of plaintiff's alleged disability in 2015. In reversing the MCAC, the Court of Appeals agreed with the magistrate, but both tribunals misapplied the traceability analysis. Traceability does not necessarily require that one continue to suffer the effects of the work-related injury when seeking benefits. Rather, it requires only that the disability follows as a sequence and natural result of the original injury, and a disabling drug addiction that occurs because of reasonable and necessary treatment for a work-

related injury could satisfy this standard. It was necessary to look beyond the cause of plaintiff's pain in 2015 and to determine whether there was a sufficient causal connection between the treatment for the work-related injury and her 2015 disability. Under the relevant caselaw, there would have been a sufficient causal connection if opioids were a reasonable and necessary treatment for plaintiff's work-related injury in 1995 and that treatment resulted in a disability, either because the opioids were still a reasonable and necessary treatment for plaintiff in 2015 or because plaintiff became addicted to opioids, which rendered her disabled in 2015. On this record, the judiciary could not determine whether the commission legally erred and misapplied the traceability analysis without explicit factual findings as to the efficacy, necessity, and effect of the opioid treatment for plaintiff's work-related injury.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED July 28, 2022

STATE OF MICHIGAN

SUPREME COURT

HELEN JORDAN,

      Plaintiff-Appellant,

v                                                                   No. 162485

DEPARTMENT OF HEALTH AND
HUMAN SERVICES, formerly known as
DEPARTMENT OF MENTAL HEALTH,

      Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

PER CURIAM.

Plaintiff in this matter asserts that she suffered an injury at work, that she was prescribed opioid painkillers as part of her treatment for that injury, that she is now dependent on those painkillers, that the painkillers render her unemployable, and that she is therefore eligible to receive disability benefits. Defendant disputes plaintiff's claims that she is unemployable and eligible for disability benefits. A magistrate held that plaintiff

was ineligible for benefits, the Michigan Compensation Appellate Commission (MCAC) reversed that decision, and the Court of Appeals reversed the MCAC.[1]  We conclude that the record in this matter is too incomplete to facilitate meaningful appellate review and that the Court of Appeals erred by adjudicating this case as a matter of law rather than remanding for factual development.  We therefore vacate the opinion of the Court of Appeals and remand to the commission for further proceedings.

Plaintiff, Helen Jordan, was formerly a nurse employed by what was at the time known as the Department of Mental Health, working at the Hawthorn Center in Northville. On October 3, 1995, she was involved in an altercation with a patient at the facility; the patient pulled her hair and sent her to the ground.  Thereafter, she complained of various pains in her back and legs, which she said resulted from the incident and left her unable to work.  Several physicians attempted a variety of treatments, including back surgery, but none resolved her issues, and she did not return to work.  Her physicians also prescribed opioid pain medication, which she used continuously thereafter and is now dependent upon.  She began receiving benefits under the Worker's Disability Compensation Act (WDCA), MCL 418.101 *et seq.*, in 1996.

In 2015, defendant, Department of Health and Human Services—the successor to plaintiff's former state government employer—asked that she submit to an independent medical examination under MCL 418.385.  She did, and was examined by Dr. Philip Mayer on February 27, 2015.  He concluded that any disability she faced "is not the result of any anatomic pathology caused by the incident of occurrence dating back to October 3, 1995."

---

[1] This body has since been renamed the Workers' Disability Compensation Appeals Commission by Executive Reorganization Order No. 2019-3.  See MCL 125.1998.

Defendant then discontinued plaintiff's benefits. Thereafter, plaintiff applied for reinstatement of her benefits, alleging that she "sustained a severe and disabling injury to her lumbar spine during patient restraining" and that she "seeks all benefits pursuant to the WDCA."

Under the WDCA, "upon the filing . . . of an application in writing stating the general nature of any claim as to which any dispute or controversy may have arisen, the case shall be set for mediation or hearing, as applicable," and "[a] worker's compensation magistrate shall hear a case that is set for hearing." MCL 418.847(1). Plaintiff testified, and the parties also submitted opinions from their respective medical and vocational experts. After reviewing the testimony, the magistrate's "Findings of Fact and Conclusions of Law" framed the dispute in these terms:

> It is undisputed that plaintiff sustained an injury to her back on October 3, 1995 while restraining a patient. It is also undisputed that plaintiff was paid worker's disability compensation payments from the date of injury in 1995 until 2015. The issue therefore is not whether plaintiff was disabled from the initial injury on October 3, 1995 but whether she continues to be disabled from the 1995 injury.

After reviewing the evidence, the magistrate concluded that "plaintiff's loss of wage earning capacity is not related to her 1995 work injury but to her opioid dependency." As a result, she denied plaintiff's claim for benefits.

After this adverse decision, plaintiff sought review before the MCAC as provided by MCL 418.859a(1). In its review, the commission faulted the magistrate's decision as a matter of law, holding "that her conclusion flies in the face" of *Staggs v Genesee Dist Library*, 197 Mich App 571; 495 NW2d 832 (1992). It concluded that plaintiff's "opioid use is directly traceable to ameliorating the well documented symptoms incurred from the

3

work incident in October of 1995" and that "the opioid prescriptions were reasonable and necessary on this particular record," meaning that "plaintiff is entitled to benefits pursuant to the reasoning of *Staggs*." At that point, it was defendant's turn to appeal, and after granting its application for leave to appeal, the Court of Appeals reversed. *Jordan v Dep't of Health & Human Servs*, 335 Mich App 57; 966 NW2d 162 (2020). The majority concluded that *Staggs* was inapplicable because plaintiff's "use of opioids was part of ongoing treatment over several years and because this case concerns whether [plaintiff] was entitled to continue receiving benefits in 2015[; therefore,] the injury-treatment examination must be viewed under the circumstances that existed in 2015." *Id*. at 72. It ultimately held that *Staggs* was distinguishable and that plaintiff was not entitled to benefits. Plaintiff then appealed in this Court, and we ordered argument on the application. *Jordan v Dep't of Health & Human Servs*, 508 Mich 951 (2021).

We believe that the record in this matter is too incomplete to facilitate meaningful appellate review. Cf. *Woody v Cello-Foil Prods (After Remand)*, 450 Mich 588; 546 NW2d 226 (1996). The WDCA defines a disability as (1) "a limitation of an employee's wage earning capacity in work suitable to his or her qualifications and training," (2) "resulting from a personal injury or work-related disease." MCL 418.301(4)(a). Here, the magistrate denied benefits to plaintiff and the MCAC reversed, but in doing so, the MCAC did not explain what the factual support was for finding that plaintiff is disabled—either by referring to the magistrate's findings or its own review of the factual record. Rather, the MCAC concluded:

> Inasmuch as plaintiff's vocational expert, Mr. James Fuller, and defendant's vocational expert, Mr. John Stokes, agree that plaintiff's opioid use precludes her from the workforce, we conclude that plaintiff is disabled

4

because of said opioid use. Because the opioid use is directly traceable to ameliorating the well documented symptoms incurred from the work incident in October of 1995, we further conclude that plaintiff is entitled to benefits pursuant to the reasoning of *Staggs*, supra.

Looking first to whether it was established that the plaintiff had "a limitation of . . . wage earning capacity in work suitable to . . . her qualifications and training," MCL 418.301(4)(a), despite the MCAC's conclusion, whether the experts agreed on this point is not apparent from the record. The magistrate concluded on this point: "Mr. Fuller testified that plaintiff's use of narcotics would render her unemployable with no vocational options and no wage earning capacity. Mr. Stokes agreed plaintiff's use of opioids would be an impediment to the jobs he located." While the MCAC may have implicitly equated Mr. Stokes's conclusion that plaintiff's use of opioids was an impediment to the jobs he found with Mr. Fuller's conclusion that plaintiff's opioid use rendered her unemployable with no vocational options and no wage-earning capacity, the MCAC did not state this explicitly. Instead, the MCAC concluded that the experts agreed that plaintiff's opioid use precludes her from the workforce, without explaining whether the experts' conclusions were equivalent or could be reconciled.

The second issue is whether any limitation in plaintiff's wage-earning capacity "result[s] from a personal injury or work-related disease." MCL 418.301(4)(a). Even assuming there was factual support for finding a limitation of wage-earning capacity in work suitable to plaintiff's qualifications and training, the MCAC did not support its conclusion that any limitation here "result[ed] from a personal injury or work-related disease." The MCAC concluded that "the opioid use is directly traceable to ameliorating the well documented symptoms incurred from the work incident in October of 1995," but

5

did not support this conclusion with factual findings, either those made by the magistrate or pursuant to its own review of the record.

In light of these deficiencies, we believe that the magistrate's decision is too incomplete to perform effective appellate review, and it would be inappropriate for the judiciary to attempt to infer factual findings. Of course, this Court held in *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691; 614 NW2d 607 (2000), that the MCAC has independent authority to perform its own fact-finding under MCL 418.861a(14). Therefore, it may well have been able to address these problems with the magistrate's decision. However, it did not purport to find other facts and instead confined itself to holding that the magistrate's decision ran afoul of *Staggs* as a matter of law. In this case, the magistrate did not make sufficient findings for either the MCAC or the judiciary to determine whether there was legal error in its determination that plaintiff was no longer entitled to benefits, and the MCAC did not supplement those deficient findings.

We conclude, then, that the combination of the decisions of the magistrate and the MCAC are too incomplete to facilitate meaningful appellate review. The magistrate's decision was insufficient for either the MCAC or the judiciary to determine "whether it understood the applicable legal standard and what facts it specifically relied upon in reaching its conclusion," *Gacioch v Stroh Brewery Co*, 426 Mich 612, 620; 396 NW2d 1 (1986), and the MCAC did not supplement those deficient findings. As a result, the Court of Appeals erred by deciding this case as a matter of law; what is needed instead are further administrative proceedings. Because "[f]indings of fact in workmen's compensation proceedings shall be conclusive in the absence of fraud unless otherwise provided by law," Const 1963, art 6, § 28, we make no factual findings of our own. Rather, we vacate the

6

decisions of the Court of Appeals and the MCAC and remand to the administrative process to fill in these gaps.[2] In light of our holding in *Mudel* that the commission has the authority to perform independent fact-finding, we remand to the commission without prejudice to it exercising its prerogative to remand to the magistrate under MCL 418.861a(12).

> Bridget M. McCormack
> Brian K. Zahra
> David F. Viviano
> Richard H. Bernstein
> Elizabeth T. Clement
> Megan K. Cavanagh
> Elizabeth M. Welch

---

[2] Although Justices VIVIANO and CAVANAGH offer opinions on the issues that should be considered on remand, we reiterate that today, all we are requiring is that the commission or the magistrate create a factual record that better supports a holding either that plaintiff is or is not entitled to continued WDCA benefits for the reasons stated in this opinion.

HELEN JORDAN,

      Plaintiff-Appellant,

v                                     No. 162485

DEPARTMENT OF HEALTH AND
HUMAN SERVICES, formerly known as
DEPARTMENT OF MENTAL HEALTH,

      Defendant-Appellee.

_____

VIVIANO, J. (*concurring*).

I agree with the Court's decision to clarify the record and the bases for the administrative decision below. I write separately to explain my view that an important issue in this case, which should be considered on remand, is whether plaintiff had an affirmative duty to seek reasonable treatment for her opioid addiction and, if so, whether the failure to do so broke the chain of causation such that her ongoing opioid addiction is no longer traceable to her 1995 workplace injury. I further believe that the difficult and complicated issue of opioid addiction in workers' compensation claims could benefit from consideration by the Legislature.[1]

_____

[1] This case is only one manifestation of a much larger public health crisis that our nation is facing involving the misuse of opioids. According to the Centers for Disease Control and Prevention (CDC), from 1999 to 2019 nearly 500,000 people died from an opioid overdose. See CDC, *Understanding the Epidemic*, <https://www.cdc.gov/drugoverdose/epidemic/index.html> (accessed July 20, 2022) [https://perma.cc/3X68-XY2P]. That number continues to increase at an alarming rate,

As the majority explains, plaintiff has consistently been prescribed opioids since 1995 to treat back and leg pain after a workplace injury.[2]  However, as early as 2000, plaintiff's doctor, Dr. Edward Washabaugh of the Michigan Pain Institute, discussed her drug dependency with her.  He noted that her chronic pain was due, in part, to narcotic dependency and discussed drug detoxification with her.  Thereafter, it appears that there were "many discussions" with plaintiff about "opioids management and dependency."  In 2016, Dr. Philip Mayer, who conducted an independent medical examination of plaintiff, recommended that plaintiff undergo a "medically supervised drug detoxification program" to wean her from her narcotic opioid dependence and to improve the "subjective perception of [her] symptoms and quality of life."

After defendant halted plaintiff's benefits in 2015, plaintiff applied for the reinstatement of her benefits.  In 2017, the magistrate denied plaintiff's request, finding that the loss of plaintiff's wage-earning capacity was not related to her workplace injury

---

with an estimated 100,306 drug overdose deaths in the United States during the 12-month period ending in April 2021, an increase of 28.5% from the same period the year before. See CDC, Press Release, *Drug Overdose Deaths in the US Top 100,000 Annually* (November 17, 2021) (accessed July 20, 2022), available at <https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2021/20211117.htm> [https://perma.cc//T5G3-22CS].

[2] As the CDC website explains, the rise in opioid-overdose deaths has occurred in three waves, beginning with the increased prescription of opioids in the 1990s. *Understanding the Epidemic* <https://www.cdc.gov/drugoverdose/epidemic/index.html>.  Then, in 2010, there was a rapid increase in overdose deaths involving heroin. *Id*.  The third wave, which began in 2013, has involved significant increases in overdose deaths involving synthetic opioids, particularly those involving illicitly manufactured fentanyl. *Id*.  Like many other national, state, and local public health agencies, the CDC's efforts to combat the opioid epidemic include "enhancing linkage to care for people with opioid use disorder and risk for opioid overdose . . . ." *Id*.

but to her opioid dependency. The Michigan Compensation Appellate Commission (the MCAC)[3] reversed that decision, holding that under *Staggs v Genesee Dist Library*, 197 Mich App 571, 576; 495 NW2d 832 (1992), plaintiff's "opioid use is directly traceable" to her work injury. The Court of Appeals disagreed, finding that *Staggs* was distinguishable because it involved a one-time treatment and arguing that the MCAC improperly "gave no weight" to the magistrate's finding that "there was no longer a traceable connection between the opioid treatment and the work-related injury." *Jordan v Dep't of Health & Human Servs*, 335 Mich App 57, 71-73; 966 NW2d 162 (2020).

Like Justice BERNSTEIN, I am not unsympathetic to plaintiff's plight. Through no apparent fault of her own, she apparently became addicted to opioids that were prescribed to her for treatment of her workplace injury more than 25 years ago. But an argument could be made that a claimant in plaintiff's circumstances has an affirmative duty to seek treatment for his or her addiction and that the failure to do so should result in the denial of workers' compensation benefits.[4] As Professor Larson explained in his treatise, though secondary injuries, like plaintiff's opioid addiction, that occur in the "quasi-course of employment" are compensable, the chain of causation for these injuries can be broken by intentional conduct by the claimant. 1 Larson, Larson, & Robinson, Larson's Workers'

---

[3] The MCAC has since been renamed the Workers' Disability Compensation Appeals Commission.

[4] There are many inpatient and outpatient therapy programs dedicated to the treatment of people with substance addiction, including programs that use medications to help patients transition from physical dependence on opioids. See, e.g., Johns Hopkins Medicine, *Treating Opioid Addiction* <https://www.hopkinsmedicine.org/opioids/treating-opioid-addiction.html> (accessed July 20, 2022) [https://perma.cc/SHK2-PP97].

Compensation Law § 10.05 (2015). In other words, the necessary "linkage between the disabling work-related injury and the reduction in pay" can be broken by the claimant's conduct. *Sweatt v Dep't of Corrections,* 468 Mich 172, 186; 661 NW2d 201 (2003) (plurality opinion). And where, as here, there are two injuries—i.e., the original back injury and the subsequent opioid addiction—there generally must be a causal connection between the two. See *Staggs*, 197 Mich App at 576; see also *Crawley v Gen Motors Truck Corp*, 259 Mich 503, 505; 244 NW 143 (1932) (explaining that for a secondary injury to entitle a claimant to compensation, "there must appear some causal connection between it and the first injury" such that "the original injury [was] a causal factor in producing the second injury").

In cases like the present, therefore, it could be argued that the refusal to seek necessary medical services to regain wage-earning capacity breaks the necessary causal link and renders the claimant ineligible for compensation. In such circumstances, it could be contended that the plaintiff's loss of wage-earning capacity (and the secondary injury precluding such capacity) would no longer be traceable to the workplace injury. Thus, although opioid dependence, for example, could otherwise be causally related to a workplace injury, that causal connection might be broken if the claimant refuses treatment of the dependency.[5]

---

[5] Justice CAVANAGH's partial dissent suggests that any duty to rehabilitate is irrelevant here because plaintiff had a legal prescription for opioids. I question whether following any legally obtained pharmaceutical prescription, without more, absolves a claimant of this duty. For example, in a case like the present one, it seems to me that the factfinder should weigh the conflicting advice to seek treatment of her addiction that the claimant received from other, nonprescribing doctors. Moreover, even legally obtained prescriptions may

4

This conclusion depends, in part, on whether the claimant has a duty to seek or accept treatment. The Michigan Worker's Disability Compensation Act, MCL 418.101 *et seq.*, indicates that, at least in certain circumstances, there is such a duty. The act states that "[i]f there is an unjustifiable refusal to accept rehabilitation pursuant to a decision of the director, the director shall order a loss or reduction of compensation . . . ." MCL 418.319(1);[6] see also *Sweatt*, 468 Mich at 185 (plurality opinion) (noting that employees are not entitled to benefits if they unjustifiably refuse to rehabilitate themselves, refuse surgery, or "refuse[] to undertake exercises designed to hasten recovery"). And this Court has previously found that before requiring an employer to compensate a workers' compensation claimant, " 'the claimant should first discharge the primary duty owing to himself and society to make use of every available and reasonable means to make himself whole.' " *Myers v Wadsworth Mfg Co*, 214 Mich 636, 644; 183 NW 913 (1924); quoting *Kricinovich v American Car & Foundry Co*, 192 Mich 687, 691; 159 NW 362 (1916).

If, on remand, the commission or the magistrate concludes that plaintiff remains disabled because of her opioid use, it would still need to be determined whether the opioid

---

come from dubious sources, such as so-called "pill mills" that "prescrib[e] or dispens[e] controlled prescription drugs inappropriately." Rigg, March, & Inciardi, *Prescription Drug Abuse & Diversion: The Role of the Pain Clinic*, 40 J Drug Issues 681 (2010).

[6] This statute covers both medical and vocational rehabilitation services and allows an employer to move for the director to order "training, services, or treatment" to "render the employee fit for a remunerative occupation." MCL 418.319(1). Such services or treatment may also be requested by the employee, carrier, or upon the motion of the director. *Id*. It appears, therefore, that this statute would allow the employer to request, and the director to order, addiction treatment or services, the refusal of which would result in a "loss or reduction of compensation." *Id*.

addiction, a secondary injury, is traceable to plaintiff's 1995 workplace injury. If plaintiff was instructed by medical professionals to seek rehabilitation for her opioid dependency but refused, in my view, this could break the causal chain such that her current addiction should no longer be considered traceable to her original injury. I therefore believe the commission or the magistrate should consider this question on remand.

As Justice BERNSTEIN's concurrence demonstrates, this issue is rife with policy concerns that are suited for the Legislature, not the courts. In this regard, it is worth noting that legislative and administrative bodies in other states have adopted rules to address the problem of long-term opioid use in workers' compensation cases. See, e.g., *Johnson v Darchuks Fabrications, Inc*, 963 NW2d 227, 229 (Minn, 2021) (explaining that the Minnesota Legislature directed the Minnesota Department of Labor and Industry to develop rules and treatment parameters for long-term use of opioid medication in workers' compensation cases); *Forte v Muccini,* 181 App Div 3d 1135, 1137; 121 NYS3d 395 (2020) (explaining that the New York Workers' Compensation Board had set forth a protocol for opioid weaning for patients who had used opioids for a long period of time to transition them to new standards of care). As Justice BERNSTEIN notes, though the Michigan Workers' Disability Compensation Agency amended its rules in 2015 to only reimburse physicians for opioid treatment prescribed within 90 days after onset of injury except for extensions under very narrow circumstances, see Mich Admin R 418.101008; Mich Admin R 418.101008a; Mich Admin R 418.101008b, these amendments do not address claims of plaintiffs who were prescribed and became addicted to opioids through long-term prescription use before 2015. Consequently, there is no legislative or regulatory guidance concerning a potentially large class of cases.

6

This case presents a difficult issue. On remand, the commission should consider whether plaintiff had a duty to seek treatment for her addiction, as this might bear upon whether her loss of wage-earning capacity is traceable to her workplace injury. Because this issue implicates important policy concerns, the Legislature might want to consider specifically addressing it. In light of these considerations, I concur.

David F. Viviano

HELEN JORDAN,

      Plaintiff-Appellant,

v

No. 162485

DEPARTMENT OF HEALTH AND
HUMAN SERVICES, formerly known as
DEPARTMENT OF MENTAL HEALTH,

      Defendant-Appellee.

_____

BERNSTEIN, J. (*concurring*).

I concur fully with the majority opinion. But I write separately because neither the language of the relevant statutes nor the language of the applicable administrative rules provides sufficient instruction about how to properly adjudicate this issue. Further, I believe this case highlights a massive problem that has the potential to create a financial catastrophe for employees and employers alike. I am particularly worried about small businesses, which make up over 99% of the employers in Michigan. See United States Small Business Administration Office of Advocacy, *2021 Small Business Profile: Michigan* (August 30, 2021), available at <https://cdn.advocacy.sba.gov/wp-content/uploads/2021/08/30142526/ Small-Business-Economic-Profile-MI.pdf> (accessed June 5, 2022) [https://perma.cc/2LUN-HWZZ]. I urge the Legislature to consider statutory solutions that would adequately balance the interests of employees who develop long-term work-related disabilities and the small businesses that may ultimately bear the

responsibility of associated costs, especially since statutory language may not put anyone on notice of the true extent of this burden.

The Michigan Worker's Disability Compensation Act (WDCA), MCL 418.101 *et seq.*, provides a system to compensate employees for medical costs and lost wages if they either sustain personal injuries at work or exacerbate preexisting conditions because of their work. MCL 418.301. To make sure employees receive due compensation, almost every employer in the state is subject to the provisions of the WDCA. MCL 418.111. To comply with the WDCA, employers may choose to purchase insurance or seek approval from the Workers' Disability Compensation Agency to self-insure. MCL 418.611. Even though a robust WDCA insurance industry exists in Michigan, one of the factors that goes into premium-setting is the loss experience, or the amount of payouts employers have made to cover their previous WDCA costs. MCL 500.2312. In other words, the compensation Michigan employees receive for their workplace injuries affects insurance costs for *all* Michigan employers. This is particularly problematic when, like here, WDCA payments may be necessary for years or even decades after the workplace injury occurred because of the medical treatment provided.

Plaintiff was employed by the state of Michigan in 1995 when she alleges she was injured at work. She began to receive WDCA benefits shortly after her injury. Those benefits continued for more than 20 years because her 1995 injury was treated continuously and with increasing dosages of opioids. Plaintiff had no history of opioid use before she was prescribed opioids to treat her workplace injury, and there was no evidence she ever used opioids without a prescription. Yet plaintiff became disabled from this opioid use,

2

receiving $153.83 in wage-loss benefits each week for more than two decades after her injury.

I doubt that plaintiff is the only employee whose workplace injuries have led to disability, the use of opioids, and the subsequent receipt of long-term WDCA benefits. In the 1990s, upon receiving reassurance from pharmaceutical companies that prescription opioids were not addictive, medical professionals relied heavily on prescribing opioids for pain management. National Institute on Drug Abuse, *Opioid Overdose Crisis* (March 11, 2021) <https://nida.nih.gov/research-topics/opioids/opioid-overdose-crisis> (accessed June 6, 2022) [https://perma.cc/PNT3-ZWQL]. Although there has been a reduction in opioid prescription over time, from 2012 through 2017, more than 7.5 million Michigan patients were treated with prescription opioids. Michigan Department of Licensing and Regulatory Affairs and Appriss Health, *Statewide Opioid Assessment: Michigan* (March 29, 2018), p 6, available at <https://www.michigan.gov/-/media/Project/Websites/lara/bpl/MAPS/Statewide-Opioid-Assessment-Michigan.pdf> (accessed June 5, 2022) [https://perma.cc/R49C-YKW7]. Despite claims from pharmaceutical companies that opioids were not addictive, it is estimated that about 8% to 12% of chronic opioid users develop an opioid-use disorder. Vowles et al, Abstract, *Rates of Opioid Misuse, Abuse, and Addiction in Chronic Pain: A Systematic Review and Data Synthesis*, 156 *Pain* (No. 4) 569 (2015). The high number of Michiganders prescribed opioids combined with the addictive nature of those substances have created the perfect storm for circumstances like these to be widespread. It is unclear how many Michiganders were prescribed opioids who now suffer from debilitating long-term opioid dependency as

a direct result of workplace injuries, but it seems likely that plaintiff is far from the only one.

Plaintiff's condition is highly sympathetic. She was injured at work and has suffered from the effects of the treatment of her initial workplace injury for decades. With this remand, we ask the Workers' Disability Compensation Appeals Commission for further factual findings that will determine whether plaintiff is entitled to continued WDCA benefits. However, whether plaintiff is entitled to such continued benefits is a difficult question given the lack of statutory clarity.

The language of the WDCA does not make it clear who should be responsible for the payment of WDCA benefits when a situation like plaintiff's develops. For injuries sustained at work, the WDCA currently requires reimbursement for (1) a "personal injury . . . [that] causes, contributes to, or aggravates pathology in a manner so as to create a pathology that is medically distinguishable from any pathology that existed prior to the injury" and (2) "[m]ental disabilities and conditions of the aging process, including but not limited to heart and cardiovascular conditions and degenerative arthritis, . . . if contributed to or aggravated or accelerated by the employment in a significant manner." MCL 418.301(1) and (2). "Mental disabilities are compensable if arising out of actual events of employment, not unfounded perceptions thereof, and if the employee's perception of the actual events is reasonably grounded in fact or reality." MCL 418.301(2). But these definitions are hardly helpful guidance in understanding who is responsible for compensating employees who sustain *years* of lost wages resulting from the treatment of their workplace injuries.

4

Moreover, in 2015, the Workers' Disability Compensation Agency amended their payment rules to reflect that reimbursement is only available for opioid treatment prescribed within 90 days after the onset of injury, except for certain extensions granted under very narrow circumstances. Mich Admin R 418.101008; Mich Admin R 418.101008a; Mich Admin R 418.101008b. At least one study has shown that this was associated with a reduction in the number of opioids that patients were prescribed through WDCA claims. Michigan Department of Licensing and Regulatory Affairs, *Study Shows Michigan has Largest Opioid Decrease in Work Comp* (June 28, 2017) <https://www.michigan.gov/opioids/nel/panel-news/news/study-shows-michigan-has-largest-opioid-decrease-in-work-comp> (accessed July 12, 2022) [https://perma.cc/GB2U-VGS8]. These amendments reflect some intent to minimize the amount of WDCA compensation available for opioid prescriptions. However, these administrative rules still do not address the core issue in this case—whether decades of wage loss stemming from the treatment of a workplace injury with opioids is compensable through the WDCA.

In sum, neither the WDCA nor the administrative rules indicate whether the employee, the employer, or the state is responsible for wages lost due to long-term opioid treatment stemming from an initial workplace injury. Without such clarity, there is no way to determine how to allocate these costs fairly. Certainly, an employee who, through no fault of their own, has a diminished or lost capacity to work for years or decades because of a medical treatment stemming from a workplace injury needs to be able to support themselves. However, if employers may be responsible for paying hundreds of dollars toward wage loss each week for decades, I fear that the lack of clarity regarding how to

equitably allocate costs could have devastating consequences for any small business that must either pay those costs outright or endure the high cost of WDCA insurance premiums.

The opioid epidemic is real.  The consequences are, and will continue to be, wide-reaching.  The Legislature is in the best position to determine the needs of both employers and employees affected by this crisis and should provide further guidance about how these costs should be allocated.

Richard H. Bernstein

# STATE OF MICHIGAN

## SUPREME COURT

HELEN JORDAN,

       Plaintiff-Appellant,

v                                       No. 162485

DEPARTMENT OF HEALTH AND
HUMAN SERVICES, formerly known as
DEPARTMENT OF MENTAL HEALTH,

       Defendant-Appellee.

_____

CAVANAGH, J. (*concurring*).

I agree with the majority that a remand to the Michigan Compensation Appellate Commission (the MCAC)[1] for additional factual findings is necessary to enable effective judicial review. I write separately to describe in greater detail why the factual findings of the magistrate and the MCAC were insufficient and to provide guidance as to what factual findings are required on remand. Specifically, in order to resolve this case I believe the MCAC must make factual findings as to (1) whether plaintiff's opioid treatments were reasonable and necessary to treat her work-related injury[2] when she began treatment in 1995, and (2) whether that opioid treatment resulted in a disability in 2015, either due to

---

[1] This body has since been renamed the Workers' Disability Compensation Appeals Commission. For ease of reference, I nonetheless refer to the body as the MCAC throughout this opinion.

[2] For the purpose of concision, I will frequently refer to plaintiff's injury that directly resulted from her 1995 work accident as her "work-related injury."

continued opioid use to treat pain caused by the work-related injury or due to an opioid addiction that developed because of treatment for the work-related injury.

In my view, the magistrate and the MCAC erred in focusing only on plaintiff's condition in 2015 and not assessing how the work-related injury—and any reasonable and necessary treatment for that injury—contributed to a disability in 2015. As noted in the magistrate's opinion, the parties stipulated that "plaintiff's personal injury arose out of and in the course of employment," but the parties disputed whether "plaintiff's disability is *due* to the alleged personal injury." Magistrate's Opinion (June 22, 2017) at 2 (emphasis added). In other words, the key issue here—as framed by the parties—is whether plaintiff suffered a disability in 2015 that was "traceable" to the work-related injury. See *Crawley v Gen Motors Truck Corp*, 259 Mich 503, 505; 244 NW 143 (1932) (holding that a plaintiff may recover benefits if a current injury causing a disability is "traceable" to the original injury).

In concluding that plaintiff was not entitled to continue receiving workers' compensation benefits in 2015, the magistrate appeared to find that plaintiff was no longer suffering any effects from the work-related injury in 2015 and that plaintiff was disabled due to her opioid addiction. Further, it was undisputed that plaintiff was prescribed opioids for the first time in 1995 after the work-related injury and that she was prescribed them continuously through 2015. Thus, implicit in the magistrate's decision is the assumption that if plaintiff no longer suffered the effects of the work-related injury in 2015, she was not entitled to benefits, regardless of whether her opioid use was reasonable and necessary to treat the work-related injury *before* 2015 and that use resulted in a disability. In light of this assumption, the magistrate found it unnecessary to assess the treatment for plaintiff's

2

work-related injury *in 1995* and limited her inquiry to the source of plaintiff's alleged disability in 2015.

In reversing the decision of the MCAC, the Court of Appeals majority agreed with the magistrate that if plaintiff was no longer suffering the effects of the work-related injury, she was necessarily not entitled to workers' compensation benefits. *Jordan v Dep't of Health & Human Servs*, 335 Mich App 57, 72; 966 NW2d 162 (2020) ("The properly framed question is whether Jordan's opioid use in 2015, i.e., the treatment at the time her benefits were halted, was in response or traceable to the 1995 work-related injury, but only to the extent that the effects of that injury still existed in 2015 when she was still being prescribed the opioids. Without this linkage, Jordan would simply be a patient receiving opioid medication for back and leg pain unassociated with a work-related injury."). The Court of Appeals further held that the connection between plaintiff's drug addiction and her work-related injury was too tenuous to support recovery of workers' compensation benefits. *Id*. at 73. I believe that both the magistrate and the Court of Appeals misapplied the traceability analysis to these facts.

In reaching its holding, the Court of Appeals acknowledged its prior decision in *Staggs*, in which the Court held that "where the reasonable treatment of a work-related injury results in disability, the injured employee is entitled to benefits, even if the underlying injury did not itself result in that disability." *Staggs*, 197 Mich App at 576. It distinguished this case from *Staggs*, noting that *Staggs* involved a one-time treatment while plaintiff here received ongoing treatment. *Jordan*, 335 Mich App at 71-72. The Court of Appeals concluded that because plaintiff was receiving ongoing treatment, she would only

3

be entitled to benefits if she was still suffering the effects of the work-related injury when she sought continued benefits in 2015. *Id*. at 72.

But *Staggs* contains no such limitation. Instead, *Staggs* recognized that a disability must be "traceable" to a work-related injury to be compensable and held that a disability is "traceable" if it occurs because of reasonable and necessary treatment for that work-related injury. *Staggs*, 197 Mich App at 575; see also *Cook v Charles Hoertz & Son*, 198 Mich 129, 130-131; 164 NW 464 (1917) (holding that one who suffered an injury after falling off of crutches prescribed due to a work-related injury was entitled to benefits where he was not violating physicians' orders or behaving negligently). "Traceability" does not *necessarily* require that one continue to suffer the effects of the work-related injury when seeking benefits. Rather, it requires only that the disability "follows as a sequence and natural result of the original injury." *Crawley*, 259 Mich at 505. And, contrary to the analysis of the Court of Appeals, a disabling drug addiction that occurs because of reasonable and necessary treatment for a work-related injury could satisfy this standard. See *Sweet v Capital Area Transp Auth*, 2006 ACO 258.[3] Therefore, plaintiff would be entitled to benefits if she took opioids as a reasonable and necessary treatment in response

---

[3] This is especially true in the context of opioids, which are widely known to be highly addictive and lead to a dependency that is difficult to overcome. See generally Mayo Clinic, *How Opioid Addiction Occurs* <https://www.mayoclinic.org/diseases-conditions/ prescriptions-drug-abuse/in-depth/how-opioid-addiction-occurs/art-20360372#:~:text= Opioids%20are%20highly%20addictive%2C%20in,powerful%20sense%20of%20well- being> (accessed July 21, 2022) [https://perma.cc/X4PK-AY3G]; Kosten & George, *The Neurobiology of Opioid Dependence: Implications for Treatment*, Science & Practice Perspectives (July 2002), pp 13-20, available at <https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2851054/> (accessed July 21, 2022) [https://perma.cc/W7RK-T3XE].

to the work-related injury and that treatment resulted in a disability in 2015, regardless of whether the initial injury persisted at that time.

Justice VIVIANO suggests that plaintiff may have had a duty to obtain treatment for her opioid addiction and that, if she was advised to seek such treatment but failed to do so, any resulting disability may not be "traceable" to the work-related injury. I do not disagree with the general proposition that a claimant has some obligation to mitigate the severity of an injury that occurs from a work-related injury, and I agree that a claimant's failure to seek treatment for opioid addiction *could* be relevant to whether their disability is traceable.[4] But it appears that any such duty would not be relevant in this case, given that plaintiff began using opioids for the first time in 1995 pursuant to a *legal prescription from a doctor* and continued receiving prescriptions for opioids through 2015. It is her *legal* opioid use (or perhaps the addiction arising from her legal use) that allegedly rendered plaintiff unemployable in 2015. See *Cook*, 198 Mich at 131. I acknowledge, as recognized by the concurrences of Justice BERNSTEIN and Justice VIVIANO, that there are currently well-known public health risks related to opioid use that doctors and policymakers must be mindful of when determining whether opioid treatments are appropriate. But I would not suggest that the MCAC should fault plaintiff for following doctor's orders, nor would I

---

[4] However, I would note that opioid addiction is commonly known to be difficult to overcome, see note 3 of this opinion, so I am not convinced that the existence of a long-term addiction, even combined with medical advice to get treatment, would *necessarily* be sufficient to render a disability not traceable. Moreover, this potential duty to mitigate would seemingly be accounted for in some respects by the requirement that a treatment that causes a disability be "reasonable and necessary." It is difficult to see how a claimant would have a duty to stop receiving treatment that is reasonable and necessary to treating a work-related injury.

5

place a duty on her to discontinue a treatment that has been consistently recommended by medical professionals.

Thus, to determine whether plaintiff was entitled to benefits in 2015, it is necessary to look beyond what was causing her pain in 2015 and to determine whether there was a sufficient causal connection between the treatment for the work-related injury and a disability in 2015. There would be a sufficient causal connection under *Staggs* if opioid medication was a reasonable and necessary treatment for plaintiff's work-related injury in 1995 and if that treatment resulted in a disability in 2015, either because that opioid use itself was disabling and remained reasonable and necessary to treat the work-related injury in 2015 or because that opioid use resulted in a disabling opioid addiction that persisted in 2015. While the magistrate appears to have concluded that plaintiff was no longer experiencing the effects of the work-related injury in 2015, she did not make the necessary factual findings as to the efficacy, necessity, and effect of the opioid treatment for the work-related injury in 1995.

When reviewing the decision of the magistrate, the MCAC correctly recognized that the magistrate erred by failing to apply *Staggs* on these facts.[5] But, as noted by the majority, the MCAC did not purport to contradict the factual findings of the magistrate or find additional facts to support its conclusion as to traceability. While the judiciary's role

---

[5] The MCAC is required to defer to the factual findings of the magistrate, but it is not required to defer to the magistrate on issues of law. Compare MCL 418.861a(3) (requiring deference to the magistrate's "findings of fact" if they are "supported by competent, material, and substantial evidence on the whole record") with MCL 418.861a(11) (providing the MCAC the authority to review, on the request of the parties, "conclusions of law" embedded in a magistrate's decision).

in reviewing the MCAC's factual findings is extremely limited, see *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691, 703; 614 NW2d 607 (2000), we clearly have the authority to review "questions of law" embedded in a final decision of the MCAC. MCL 418.861a(14). In order to exercise that authority, there must be sufficient factual findings for the judiciary to properly resolve any "questions of law" implicated in a decision by the MCAC. And I agree with the majority that, given the judiciary's limited role related to the factual findings of the MCAC, "it would be inappropriate for the judiciary to attempt to infer factual findings." *Ante* at 6.

In this case, the judiciary cannot determine whether the MCAC legally erred and misapplied the traceability analysis without explicit factual findings as to the efficacy, necessity, and effect of the opioid treatment for plaintiff's work-related injury. For these reasons, I concur with the Court's decision to remand to the MCAC, and I encourage the MCAC on remand to make the pertinent factual findings stated in this opinion.[6]

Megan K. Cavanagh
Elizabeth M. Welch

---

[6] I agree with the majority that the MCAC has the authority to perform independent fact-finding on remand, *Mudel*, 462 Mich at 714, and that it "*may* remand" to the magistrate "if it is determined that the record is insufficient for purposes of review." MCL 418.861a(12) (emphasis added). However, I emphasize that the MCAC "is not *required* to remand a case to the magistrate" just because "the magistrate has failed to make full factual findings." *Mudel*, 462 Mich at 711. Rather, the MCAC may make its own findings without a remand if it "is presented with a record that allows it to intelligently make its own factual findings . . . ." *Id*.